# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. RHAKIM MARTIN

**Appeal from the Criminal Court for Shelby County**
**No. 11-05719      Chris Craft, Judge**

**No. W2013-02013-CCA-R3-CD  - Filed February 10, 2015**

The defendant, Rhakim Martin, was convicted by a Shelby County Criminal Court jury of carjacking, a Class B felony, and employment of a firearm during the commission of a dangerous felony, a Class C felony, and was sentenced to an effective term of sixteen years in the Tennessee Department of Correction.  On appeal, he argues that:  (1) his conviction for employing a firearm during a dangerous felony violates the terms of Tennessee Code Annotated section 39-17-1324(c) and the prohibitions against double jeopardy; (2) the failure to name the predicate felony in the indictment for employment of a firearm during the commission of a dangerous felony voids the conviction; (3) the trial court erred in denying his motion to suppress the victim's identification of him; (4) the evidence is insufficient to sustain his convictions; and (5) the trial court committed plain error by failing to charge the jury on possession of a firearm during the commission of a dangerous felony as a lesser-included offense of employing a firearm during the commission of a dangerous felony.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., joined.  ROBERT L. HOLLOWAY, JR., J., Not Participating.

Lance R. Chism (on appeal) and Paul K. Guibao (at trial), Memphis, Tennessee, for the appellant, Rhakim Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Senior Counsel; Amy P. Weirich, District Attorney General; and Alexia Crump, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

# FACTS

This case arises out of the carjacking of the victim, Christie Currie, on May 22, 2011, when she drove by her boyfriend's house to check his mailbox for him.

## Motion to Suppress

Prior to trial, the defendant filed a motion to suppress the victim's photographic identification of him, asserting that it should be suppressed because the victim viewed his photograph in an online database of jail inmates prior to making the identification at the police station.

At the hearing, Detective Phillip Gooch, with the City of Bartlett Police Department, testified that he was assigned to the FBI Safe Streets Task Force on May 22, 2011, investigating violent crimes. On that date, he interviewed the victim of a carjacking, who relayed that she was inside her Toyota Camry reaching out to the check the mail when a man approached her. The victim told him that the man came up behind her, held her at gunpoint, took her purse, and demanded that she exit the vehicle. The man then entered the vehicle and drove off. Detective Gooch recalled that a suspect was eventually developed when the victim's vehicle was involved in a traffic crash. The victim's vehicle was unoccupied when it was located, but an officer found traffic citations in the defendant's name inside the vehicle. A "very short time later," the officer recognized the defendant in the area of the crash, and the defendant was taken into custody.

Detective Gooch testified that he was notified that the defendant was in custody and, on June 14, 2011, asked his partner to prepare a photographic array containing the defendant's photograph to show the victim. Before viewing the array, Detective Gooch explained to the victim that the carjacker may or may not be included in the array. When shown the array, the victim "immediately" identified the defendant as the carjacker. The victim circled the defendant's photograph and wrote, "This is the guy that carjacked me on 5/22/11 at gunpoint."

Detective Gooch testified that before he showed the victim the array, she told him that "once she was notified by the police that her car had been located, she got online to the Shelby County Who's In Jail website and . . . began clicking through recent bookings and that while doing that she had seen the person that carjacked her." Detective Gooch said that he never told the victim to look on the website and was not present when she did so. Detective Gooch explained that the website was

designed for the public, you can enter a defendant's name if you know their name. I believe you can search for one by booking number, or you can just click on a tab and there's a recent bookings tab. And it has just a list of names and booking number. It doesn't show the charge on that screen. But it's just names, booking numbers, dates, and times and it lists all the inmates that have been booked in the Shelby County jail, I think males and females. There's dozens of photographs. I think every inmate for the last 48 or 72 hours or some time period like that is under that tab.

On cross-examination, Detective Gooch admitted that he noted in his supplement that the victim reported that she had gone onto the website and saw the carjacker's photograph on the day she went to the police station to view the array. However, he clarified that he was not actually sure when the victim viewed the website and did not know when she was notified that her car had been recovered. The detective stated that the defendant's jail booking photograph had been used in the array.

The victim testified that she was called and informed that her car had been recovered and was asked to come in and view an array of possible suspects. She was not told whether anyone had been arrested in regards to the recovery of her car. She said that she had viewed the "Who's In Jail" website before she was called and asked to come to the police station to view the array. She explained that she had been regularly checking the website since the time of the carjacking. Prior to viewing the array, the victim told the officers that she "went online and was just clicking different names until [she] s[aw] the person that carjacked [her]."

The victim testified that she looked at the website on her own initiative and that no one was present when she viewed the website telling her whom to pick. When she picked the defendant out of the array at the police station, she did so because "that was the person who carjacked [her]," and she was positive of her identification. The detective did not tell her that a photograph of the person who carjacked her would be in the array.

The victim testified that, when she looked at the website, she clicked on "maybe six" photographs before she saw the person who carjacked her. She was never told that the perpetrator had been arrested. She said that she looked online and saw the perpetrator's photograph "[n]o more than a day" before being called to come in and view an array. The victim stated that the online photograph of the person she recognized as the perpetrator did not tell her the offense for which the person was arrested. She explained that she started looking at the photographs from the top of the list but narrowed her search based on the arrestee's date of birth, elaborating, "Of course I looked at the date of birth. I'm not going to pick anyone that's date is 1969 or nothing like that because it wasn't an older person. So

-3-

that narrowed it down looking at the date of birth."

**Trial**

At trial, the victim testified that, around 8:30 p.m. on May 22, 2011, she drove her 2011 Toyota Camry to her boyfriend's house to check his mail. When she pulled up to the mailbox, she rolled down the window and stuck her hand in the box. As she did so, a man, later identified as the defendant, came up behind her, put a gun to the back of her head, and told her to give him everything she had. The victim reached over for her purse, and the defendant "came around and told [her] to get out of the car." She noticed that the defendant was on a bicycle. The victim got out of the car and ran to a neighbor's house. While waiting for the neighbor to answer the door, the victim looked back down the street and saw the defendant sitting in the driver's seat of her car and another man "loading the bike in [her] car." She was able to see inside the car "because the lights were on because the door was open."

The victim testified that, at the time of the carjacking, it was not yet dark outside but "was getting dark." There was a street light across the street and one between the two houses. The lighting was good, and the victim could see clearly. She described the gun the defendant pointed at her as a black automatic. She recalled that the defendant came around from behind her so that she could see him, and he stood about six feet away as he pointed the gun in her face and told her to get out of the car. She looked at the defendant and the gun for about fifteen seconds. The victim was "terrified" and afraid that she was "going to die or be shot." She had her purse, containing her phone, driver's license, and social security card, in the car and that was taken with the car.

The victim testified that, once inside the neighbor's house, the neighbor called the police to report the incident. In describing the perpetrator to the police, the victim said that he was wearing a black shirt and dark pants and was "young seventeen to twenty, dark skin, no facial hair, long hair cut, and I'd say he had like beady eyes." She reiterated that he had distinctive, "beady eyes." She said that about three weeks later, on June 14, 2011, a detective called and asked her to come to the police station to view a photographic array. She was given a form that explained the process of selecting someone from an array, and then was shown the array. She identified the defendant in the array and was 100% sure that he was the carjacker. She said that she picked the defendant from the array because he was "the person who did it and [she] was sure of it."

The victim testified that between the time of the carjacking and when she was notified that her car had been found, she visited a website called "Shelby County who was in jail" a few times. The website displayed photographs of inmates, and the victim thought that she

could identify the carjacker if she saw a photograph of him "[b]ecause [she] never forgot his face." She looked at the inmates' birth dates to decide which photographs to view. The victim clicked on five to seven photographs before she saw the defendant's photograph. She recognized the defendant as the carjacker, but the website did not tell her what the defendant had been arrested for or charged with. When she met with Detective Gooch to view the array, she told him that she had looked on the website and found the perpetrator. However, she said that she picked the defendant out of the array because "that was who did it," not because she had seen his photograph on the website. The victim was adamant that she saw the defendant's photograph on the website before she was called and asked to come in to view an array.

Officer Alex Hudson with the Memphis Police Department testified that he was patrolling in the Frayser area on June 14, 2011, around 2:00 a.m. when he saw a black Toyota Camry coming at him on the wrong side of the road. He pulled over, and the car drove by him at a high rate of speed. He could not see the driver of the car because the car was traveling too fast. He turned around to follow the car and found it "empty wrecked out" at the gate of an apartment complex. Officer Hudson ran the VIN number on the car in order to tow it and discovered that it had been carjacked. He also ran the license plate number and discovered that it belonged to another Toyota Camry. Inside the car, Officer Hudson found two cell phones and two traffic tickets in the front console. Both tickets had been issued to the defendant. He ran the defendant's driver's license number, which was on the tickets, and obtained a photograph of the defendant.

Officer Hudson testified that about fifteen to twenty minutes after he began inventorying the Camry, he saw a Chrysler Concord coming out of the apartment complex. He and another officer at the scene saw that the vehicle had an expired license plate, so they stopped the vehicle. Officer Hudson recognized the defendant, who was driving the Concord, as the same person to whom the tickets in the black Camry had been issued. There were two other people in the vehicle with him. When Officer Hudson asked the defendant about the black Camry, he said that he had been driving the car and that he got it from his cousin, Terrence Butts. The defendant was taken into custody.

Officer Michael Spearman, a crime scene investigator with the Memphis Police Department, testified that he processed the black Toyota Camry on June 14, 2011. Officer Spearman took photographs of the vehicle and collected property from inside it, which he tagged into evidence. He dusted the car and two traffic tickets found inside it for fingerprints. He found no fingerprints on the vehicle but collected latent prints on the traffic tickets, which he sent for analysis.

Officer Christopher Parker with the Memphis Police Department identified a traffic citation that he issued to the defendant on May 30, 2011. The vehicle the defendant was driving at the time was a four-door Toyota Camry.

Officer Laneeze Stepney, also with the Memphis Police Department, identified a traffic citation that he issued to the defendant on June 7, 2011. The defendant was driving a black four-door Toyota Camry at the time of the stop.

Robert Winston, a latent print examiner with the Memphis Police Department, testified that he received various prints from the victim's Toyota Camry to analyze on June 14, 2011. Winston determined that a palm print and fingerprint lifted from the outside of the driver's side door belonged to Terry Jacobs. Two fingerprints lifted from the passenger side vent window and one palm print from a piece of paper in the car belonged to Quintrell Earl Austin. A final print found on one of the traffic tickets belonged to Officer Hudson. None of the prints lifted from the car matched the defendant's.

Special Agent Thomas Zimmer with the National Insurance Crime Bureau, the "criminal investigative arm of the insurance industry," testified that his office's records indicated that the Memphis Police Department received a complaint on May 22, 2011, that the black Camry had been taken in a carjacking and that the victim reported the carjacking to her insurance company.

Detective Phillip Gooch with the City of Bartlett Police Department testified that he was assigned to the case the day after the carjacking. Detective Gooch interviewed the victim, and she gave him a description of the two suspects involved in the crime. She described the perpetrators as "black males, one of them a darker complexion, one of them a medium complexion. She guessed that their age was approximately seventeen to twenty." The victim told Detective Gooch that she saw one of the perpetrators "very well." This individual was the darker-complexioned of the two, had no facial hair, was wearing dark clothes, and was armed with a dark-colored handgun.

Detective Gooch testified that he was notified that the victim's vehicle had been found on June 14, 2011. He explained how the defendant was developed as a suspect:

> Just before the vehicle was recovered the Memphis Police Uniformed Officers had seen the vehicle and the vehicle became involved in some type of traffic crash. The driver of the Camry at that time fled the scene and the Memphis Police Officers found two traffic citations inside the vehicle that had been issued after the carjacking.

Both of the citations had been issued to [the defendant] while the Officers were still on the scene, and discovered then that it was actually a carjacked vehicle. [The defendant] was leaving the area as a passenger in another vehicle and one of the Officers recognized him . . . and arrested him at that time.

Detective Gooch testified that he contacted his partner, Detective Beasley, and asked him to prepare a photographic array that included the defendant's photograph and arrange for the victim to come in and meet with him. The victim came to the police station on June 14, 2011, and, before showing her the array, Detective Gooch gave her instructions, including that the perpetrator may not be in the lineup. Detective Gooch did not give the victim any hints or suggestions on which individual to pick. He said that the victim identified the defendant "immediately."

Detective Gooch testified that the victim told him that, after she was notified that her car had been recovered, she went onto the jail booking website and looked through recent booking photos. She told the detective that she had seen the carjacker in the photos and knew that he was in custody. After identifying the defendant out of the array, the victim told the detective that he was "the person she had seen on the website and knew to be the person that carjacked her." Detective Gooch said that he was not with the victim when she looked at the website and had not told her to do so. Detective Gooch acknowledged that the photograph of the defendant that the victim saw on the website was the photograph that was placed in the array.

The defendant elected not to testify or present any proof.

After the conclusion of the testimony, the jury convicted the defendant of carjacking and employment of a firearm during the commission of a dangerous felony.

## ANALYSIS

### I. Tennessee Code Annotated section 39-17-1324(c) and Double Jeopardy

The defendant argues that his conviction for employing a firearm during the commission of a dangerous felony violates the terms of Tennessee Code Annotated section 39-17-1324(c) and the prohibitions against double jeopardy.

The statute in question provides, in pertinent part, as follows:

(b) It is an offense to employ a firearm during the:

(1) Commission of a dangerous felony;

(2) Attempt to commit a dangerous felony;

(3) Flight or escape from the commission of a dangerous felony; or

(4) Flight or escape from the attempt to commit a dangerous felony.

(c) A person may not be charged with a violation of subsection (a) or (b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

. . . .

(i) As used in this section, unless the context otherwise requires:

(1) "Dangerous felony" means:

. . . .

(D) Carjacking, as defined in § 39-13-404[.]

Tenn. Code Ann. § 39-17-1324(b), (c), (i)(1)(D).

The Double Jeopardy Clause of the United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]"  U.S. Const. amend. V.  Article I, section 10 of the Tennessee Constitution similarly provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb."  In State v. Watkins, 362 S.W.3d 530 (Tenn. 2012), our supreme court abandoned the State v. Denton, 938 S.W.2d 373 (Tenn. 1996), four-factor test previously employed by Tennessee courts in determining whether dual convictions violate the prohibition against double jeopardy.  Instead, the court adopted the same elements test enunciated by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 304 (1932).  Under the Blockburger test, the threshold inquiry is whether the defendant's convictions arose from the same act or transgression.  Watkins, 362 S.W.3d at 545.  If the convictions do not arise from the same act or transgression, the state and federal prohibitions against double jeopardy are not implicated, and the inquiry ends.  Id.

-8-

If, however, the convictions arose from the same act or transgression, the court must then determine whether the legislature intended to allow the offenses to be punished separately. Id. at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. Id. at 557. "The court makes this determination by examining statutory elements of the offenses in the abstract, rather than the particular facts of the case." State v. Cross, 362 S.W.3d 512, 520 (Tenn. 2012) (citations omitted). "[I]f each offense includes an element that the other does not, the statutes do not define the 'same offense' for double jeopardy purposes," and courts "will presume that the Legislature intended to permit multiple punishments." Watkins, 362 S.W.3d at 557.

The offense of carjacking may be committed in either of two ways: by use of a deadly weapon, or by force or intimidation. Tenn. Code Ann. § 39-13-404(a).

Again, the defendant argues that his conviction for the firearm offense violates the statute and the prohibitions against double jeopardy because, although he was indicted for committing the carjacking by force or intimidation, he used a firearm to cause the force and intimidation. He bases his argument on an extension of this court's opinion in Anthony D. Byers v. State, No. W2011-00473-CCA-R3-PC, 2012 WL 938976 (Tenn. Crim. App. Mar. 15, 2012), perm. app. denied (Tenn. Aug. 15, 2012). In Byers, this court granted post-conviction relief after determining that section 1324(c) had been contravened by that petitioner's convictions of especially aggravated kidnapping and possessing a firearm during the commission of a dangerous felony, which rendered the firearm conviction void. Id. at *8-9. In that case, the petitioner was indicted for committing the underlying dangerous felony by use of a deadly weapon, and the State argued that there was a substantive distinction between "deadly weapon" and "firearm." Id. at *8. This court disagreed with the State's argument, noting:

> If the State could avert the constraints of the statute by always using the term "deadly weapon" instead of "firearm" when the deadly weapon at issue was clearly and solely a firearm, then section 1324(c) would essentially become meaningless because the State would never use the term "firearm" in an indictment. We cannot believe that it was our legislature's intent to draft a statute that could so easily be circumvented with a simple change of phraseology in the indictment.

Id. at *9.

We note that other panels of this court have rejected the same arguments raised by the petitioner in this case. See Oscar Thomas v. State, No. W2012-01646-CCA-R3-PC, 2013

WL 5761398, at *5-8 (Tenn. Crim. App. June 28, 2013); State v. Jeremiah Dawson, No. W2010-02621-CCA-R3-CD, 2012 WL 1572214, at *5-7 (Tenn. Crim. App. May 2, 2012), perm. app. denied (Tenn. Sept. 20, 2012). In the Dawson case, the defendant was convicted of aggravated robbery, carjacking, and employing a firearm during the commission of a dangerous felony. Id. at *1. On direct appeal, the defendant argued that his "dual convictions for carjacking and employing a firearm during the commission of a dangerous felony violate[d] double jeopardy because[, even though he had been charged with carjacking by force or intimidation,] he used the firearm to intimidate the victims during the carjacking." Id. at *5.

This court rejected the defendant's argument. The panel looked at the statutory language of section 1324(c) and emphasized that the statute prohibits prosecution when "'possessing or employing a firearm is an essential element of the underlying dangerous felony *as charged*.'" Id. at *6 (quoting Tenn. Code Ann. § 39-17-1324(c)) (emphasis added in Dawson ). The panel concluded that the use of the term "as charged" by the legislature indicated that "the legislature was authorizing, even encouraging, the State strategically to indict a defendant for both felonies." Id. at *7. Accordingly, this court concluded that the dual convictions did not violate double jeopardy because "the legislature clearly intended to permit multiple punishment for carjacking by use of force or intimidation and employing a firearm during the commission of a dangerous felony." Id. This court further concluded that "the State's charging carjacking by use of force or intimidation and employing a firearm was not in direct contravention to Tennessee Code Annotated section 39-17-1324(c)." Id.

Likewise, in Oscar Thomas, 2013 WL 5761398, the petitioner challenged his guilty plea convictions for carjacking and employing a firearm during the commission of a dangerous felony on grounds that the dual convictions violated section 39-17-1324(c). Id. at *5-6. The petitioner in Oscar Thomas relied on Anthony D. Byers in support of his argument. The Oscar Thomas panel relied on the Jeremiah Dawson decision and then distinguished Anthony D. Byers as follows:

> Contrary to Byers, in the instant case, the State was not playing "fast and loose" with the language with which it charged the Petitioner with carjacking. Cf. Anthony D. Byers, 2012 WL 938976, at *9. Rather, the State had an option, expressly provided by the statutory language, as to how it charged the Petitioner with carjacking. It chose, legitimately, to charge the Petitioner with having committed carjacking by force or intimidation. The use of a firearm is not an essential element of a carjacking alleged to have been committed by force or intimidation. That a firearm may have been the means of accomplishing the force or intimidation in a particular case does not transform the use of the firearm into an essential element of the carjacking.

-10-

Accordingly, the Petitioner's conviction of employing a firearm during the commission of a dangerous felony does not contravene section -1324(c). Therefore, he is not entitled to post-conviction relief on this basis.

Oscar Thomas, 2013 WL 5761398, at *8; see also James Garrett v. State, No. W2012-01994-CCA-R3-PC, 2014 WL 1410292, at *5-7 (Tenn. Crim. App. Apr. 10, 2014). We wholeheartedly agree with this distinction and determine that the panel's reasoning is also the appropriate reasoning in this case. We are unpersuaded by the defendant's assertion that the aforementioned cases were wrongly decided. Therefore, we conclude that the defendant's convictions for carjacking and employing a firearm during the commission of a dangerous felony do not violate the terms of Tennessee Code Annotated section 39-17-1324(c) or the prohibitions against double jeopardy.

## II. Failure to Name the Predicate Felony

The defendant next argues that the indictment failed to properly charge him with employment of a firearm during the commission of a dangerous felony in that it did not name the underlying predicate felony, thus voiding the conviction.

Tennessee Code Annotated section 39-17-1324 provides that "[i]t is an offense to employ a firearm during the: (1) [c]ommission of a dangerous felony; [or] (2) [a]ttempt to commit a dangerous felony[.]" Tenn. Code Ann. § 39-17-1324(b)(1), (2). The statute then provides a list of predicate offenses considered dangerous felonies. See id. § 39-17-1324(i)(1). The statute requires that a charge of its violation "be pled in a separate count of the indictment or presentment and tried before the same jury and at the same time as the dangerous felony." See id. § 39-17-1324(d). However, the statute is silent on whether the predicate dangerous felony must be named in the count charging a violation of section 39-17-1324.

In this case, the defendant was indicted for only one "dangerous felony" enumerated in the statute as possible predicate felonies – carjacking. The carjacking count of the indictment alleged that the defendant committed carjacking on May 22, 2011. The count charging employment of a firearm made reference to both sections 39-17-1324(b) and 39-17-1324(i)(1) and stated that the offense was committed on May 22, 2011. In addition, the final page of the indictment, which was signed by the grand jury foreperson, plainly lists all of the charges against the defendant. To see what specific dangerous felony would serve as the predicate offense for the employment of a firearm charge, the defendant needed to only look back to the carjacking count of the indictment, the only "dangerous felony" count in the indictment and only other charge against him, and thus would have notice of the predicate felony relied on for the firearm charge. The situation might have been different had the

defendant been charged with several "dangerous felonies" that could have served as the predicate offense for his employment of a firearm charge, but such is not the case here. See, e.g., State v. Alvin Brewer and Patrick Boyland, Nos. W2012-02281-CCA-R3-CD and W2012-02282-CCA-R3-CD, 2014 WL 1669807, at *28 (Tenn. Crim. App. Apr. 24, 2014), perm. app. denied (Tenn. Sept. 18, 2014).

In State v. Michael L. Powell and Randall S. Horne, No. E2011-00155-CCA-R3-CD, 2012 WL 1655279 (Tenn. Crim. App. May 10, 2012), this court touched on the issue of whether an indictment for employment of a firearm during the commission of a dangerous felony must specify the underlying predicate felony. See id. at *12-15. However, the panel did not ultimately decide the issue, instead arriving at a disposition on other grounds. See id. at *13-15. The Michael L. Powell panel cited State v. Christopher Ivory Williams, No. W2009-01638-CCA-R3-CD, 2011 WL 1770655, at *10 (Tenn. Crim. App. May 9, 2011), perm. app. denied (Tenn. Aug. 24, 2011), prior to resolving the case on other grounds, noting that the Christopher Ivory Williams court had held that a felony murder charge that failed to designate the predicate felony was fatally defective, but the trial court's error in failing to dismiss the charge was harmless because the defendant was also convicted of premeditated murder. However, in addition to the fact that Christopher Ivory Williams involved a different statute than the present case, the cases are also dissimilar in that the defendant in Williams was charged with two felonies that could serve as predicates for a felony murder charge and did not specify which of the two would serve as the predicate, but here there was only one possibility for the predicate offense.

We conclude that this case is most similar to State v. Demeko Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085 (Tenn. Crim. App. May 10, 2013), perm. app. denied (Tenn. Oct. 17, 2013), a case in which the defendant was indicted in a four-count indictment for two counts of first degree murder, one count of attempted first degree murder, and one count of employing a firearm during a dangerous felony. Id. at *1. The defendant in that case asserted that his firearm conviction was void because the State failed to allege a predicate felony in the indictment. Id. at *19. This court rejected that claim, holding:

> [A]lthough each count of the indictment appears on a separate page and there are two different victims, only the charge of attempted first degree murder qualifies as a dangerous felony under Code section 39-13-1324. We believe it is "reasonably clear" that the charge of employing a firearm during the commission of a dangerous felony is connected to the count of attempted first degree murder such that the indictment is not void for lack of notice. [State v.] Youngblood, 287 S.W.2d [89,] 91 [(Tenn. 1956)]. Thus, the failure of the State to specify the predicate felony in [it] does not void the indictment in this case.

Id. at *22.

We conclude, as in <u>Demeko Gerard Duckworth</u>, that there was no possibility of confusion in this case or lack of notice because there was only one dangerous felony that could serve as the underlying predicate felony.

### III. Motion to Suppress

The defendant next argues that the trial court erred in denying his motion to suppress the victim's identification of him.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). Moreover, the party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." <u>State v. Keith</u>, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. <u>See id.</u> The application of the law to the facts found by the trial court is a question of law and is reviewed <u>de novo</u>. <u>State v. Walton</u>, 41 S.W.3d 75, 81 (Tenn. 2001); <u>State v. Crutcher</u>, 989 S .W.2d 295, 299 (Tenn. 1999); <u>State v. Yeargan</u>, 958 S.W.2d 626, 629 (Tenn. 1997).

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968). In <u>Neil v. Biggers</u>, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. <u>Id.</u> If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." <u>Id.</u> (internal quotations omitted); <u>see also</u> <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty

demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

"[T]he law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 196). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" Id. (quoting Stovall, 388 U.S. at 301-02). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons, 390 U.S. at 383.

Showup identification procedures have long been considered to be "inherently suggestive and unfair to the accused." State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). For this reason, Tennessee courts have repeatedly condemned the use of showups as a means of establishing the identity of an individual suspected of committing a crime, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. (citations omitted).

Again, the defendant argues that both the victim's pretrial and in-court identifications of him should have been suppressed because the identification procedure was unduly suggestive.

In denying the defendant's motion to suppress, the trial court ruled as follows:

[The victim] was carjacked while in her car reaching into her mailbox to get her mail. She saw the carjacker while he forced her to turn over her purse, cell phone and car at gunpoint on May 22, 2011. She began routinely checking the website "Who's in Jail?" every few days at http://injail.shelby-sheriff.org/kiosk.php, clicked on "Recent Bookings," and then clicked on the

-14-

names of males with the approximate date of birth of her carjacker to see if she recognized any of them. As the officer testified and as anyone clicking on that website can observe, a list of several hundred persons appears in approximate order of booking into the jail, with their names, date of birth, gender and race listed. Upon choosing a name and then clicking on "details," that person's booking photo appears.

A month went by, with the victim checking the website at intervals with no results, when her car was found wrecked. The officer responding to the accident looked in the abandoned car and found the defendant's name on two citations inside the car. Apparently, the tag on the Toyota Camry had been stolen from another car with a similar make and appearance. The officer found the defendant at the scene and placed him under arrest. The case officer then called the victim, telling her only that her car had been recovered and that he wished her to view a photo spread. Before she came down on June 14th, she checked the web site again and after about six photographs she saw the photo of her carjacker, who was the defendant. She appeared on the 14th and told the officer she had seen the carjacker's booking photo on the website, then viewed the photo spread and immediately identified the defendant's photo as her carjacker. The defendant argues that the photo lineup was unfair to the defendant because the victim had seen his photograph prior to the lineup's having been given, and therefore the lineup identification should be suppressed.

The first identification of the defendant by the victim can hardly be described as a "showup," because she had looked at many, many photos for a month prior to seeing the defendant's photo, making no identification. Even when she recognized him in the booking photo after being called by the police to come view a lineup and being told that her car had been recovered, the defendant's photo was approximately the sixth photo on which she had clicked. Even if it could be considered a showup of sorts, in all of this investigation on her part there was no state action. She was not told by the police that anyone had been arrested in conjunction with her car's recovery and the booking photos on "Who's in Jail?" contain no indication of the type of offense for which the booked person was arrested. The police had no idea she was conducting her own investigation until she appeared for the photo lineup and told them.

The United States and Tennessee Constitutions protect defendants from their governments, but not from the independent investigation of their victims.

-15-

Our Tennessee Supreme Court in *State v. Reid*, 91 S.W.[3]d 247, 272 (Tenn. 2002), held that it is well-settled Tennessee law that in the absence of state action in the identification process, constitutional due process rights are not implicated, and that therefore the analysis adopted by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) is not appropriate. . . .

Because no state action was involved, suppression of the photo lineup is not warranted. The viewing of the booking photo by the victim within 24 hours of the giving of the photo spread may go to the weight the jury may give that identification, but it does not affect its admissibility.

We conclude that the trial court properly denied the defendant's motion to suppress. As found by the trial court, there was no state action in the initial identification by the victim. Our supreme court has noted that "it is well-settled Tennessee law that in the absence of state action in the identification process, constitutional due process rights are not implicated[.]" Reid, 91 S.W.3d at 272. Here, the victim perused the "Who's in Jail" website completely on her own initiative. The mere fact that the website was operated by the sheriff's department does not transform the victim's actions into state action.

In any event, even if there was state action, there is no proof that the identification procedure was unduly suggestive. There were numerous photographs on the website and, even though the victim was able to narrow her search based upon the date of birth of the inmates, the website did not tell the victim the crimes for which the individuals had been arrested. Even when the victim recognized the defendant in a booking photograph after being told that her car had been recovered, the defendant's photograph was approximately the sixth on which she clicked. Moreover, when the victim looked at the website, she did not know that anyone had been arrested in connection with the carjacking; she was only informed that her car had been recovered. Finally, even though the victim told Detective Gooch that she had viewed the inmate website and seen a photograph of the carjacker, there is no proof that the detective knew whose photograph the victim had identified before he showed her the array that contained the defendant's photo. Under these circumstances, the proof does not support the defendant's claim that the identification procedure was unduly suggestive.

Furthermore, even if the identification procedure was unduly suggestive, the victim's identification of the defendant was reliable under the Biggers test. The victim had the opportunity to view the defendant at the time of the carjacking. It was not yet dark outside and there was a street light across the street and between the two houses, allowing her to see clearly. The defendant was approximately six feet away, and the victim looked at him and the gun for approximately fifteen seconds. Later, while the victim was on the neighbor's

front porch, she saw the defendant sitting in the driver's seat of her car; she could see inside because the lights were on inside the car. The victim gave the police a relatively detailed description of the defendant, and she was certain of her identification. The length of time between the crime and identification was only three weeks. Considering these circumstances, the victim's identification of the defendant was reliable.

## IV. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence, arguing that the proof is insufficient to establish his identity as the perpetrator and that the evidence "strongly supports" a finding that two other men were responsible for the carjacking.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Carjacking is defined as "the intentional or knowing taking of a motor vehicle from the possession of another by use of . . . [a] deadly weapon; or . . . [f]orce or intimidation." Tenn. Code Ann. § 39-13-404(a). Moreover, it is an offense to employ a firearm during the commission of a dangerous felony. Id. § 39-17-1324(b)(1). "Dangerous felony" includes carjacking. Id. § 39-17-1324(i)(1)(D).

The defendant does not dispute that a carjacking took place; he only disputes his identity as the perpetrator. However, the identity of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id. Here, viewed in the light most favorable to the State, the evidence shows that when the victim pulled up to the mailbox at her boyfriend's house, the defendant came up behind her, put a gun to the back of her head, and told her to give him everything she had. As the victim reached over for her purse, the defendant came around from behind her so that she could see him. He stood about six feet away as he pointed the gun in her face and told her to get out of the car. The victim looked at the defendant and the gun for about fifteen seconds. Although it "was getting dark" outside, there was a street light across the street and one between the two houses, allowing the victim to see clearly. The victim saw the defendant again while she was standing on a neighbor's porch. She looked back down the street and saw him sitting in the driver's seat of her car. She was able to see inside the car "because the lights were on because the door was open."

The victim gave the police a relatively detailed description of the perpetrator: he was wearing a black shirt and dark pants and was "young seventeen to twenty, dark skin, no facial hair, long hair cut" and had distinctive, "beady eyes." She identified the defendant in a photographic array and was 100% sure that he was the carjacker. Additionally, prior to

viewing the array, the victim had already independently identified the defendant on a website of jail inmates.

In addition, the victim's identification of the defendant as the carjacker is supported by additional evidence. When the victim's car was recovered, officers found inside it two traffic tickets that had been issued to the defendant. Officers Parker and Stepney both testified that they issued the defendant the tickets while he was driving a four-door Toyota Camry. Moreover, Officer Hudson testified that fifteen to twenty minutes after he found the stolen Camry crashed at the gate of the apartment complex, he caught the defendant driving away from the apartments in another car. The defendant admitted to Officer Hudson that he had been driving the Camry. Although the defendant offered an explanation as to how he ended up driving the victim's car, it was within the prerogative of the jury to not believe the defendant's explanation.

## V. Jury Charge

The defendant lastly argues, by way of supplemental brief, that the trial court committed plain error by failing to charge the jury on possession of a firearm during the commission of a dangerous felony as a lesser-included offense of employing a firearm during the commission of a dangerous felony.

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

The defendant relies on the recent Tennessee Supreme Court case, State v. Broderick Devonte Fayne, __ S.W.3d __, No. W2012-01488-SC-R11-CD, 2014 WL 5430049 (Tenn. Oct. 27, 2014), in which our supreme court determined that possession of a firearm during the commission of a dangerous felony is a lesser-included offense of employment of a firearm during the commission of a dangerous felony, as the basis for his claim. Id. at *6-7. However, he acknowledges that the Fayne court determined that the defendant in that case was not entitled to plain error relief because the record failed to establish the breach of a clear and unequivocal rule of law. Id. at *8. The court held:

While a defendant is entitled to a correct and complete charge of the law, [State v. Page, 184 S.W.3d 223, 229 (Tenn. 2006)], this Court has previously held that the omission of an instruction on a lesser included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser included offense is not apparent based on prior law, see State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003) (holding that the trial court did not commit plain error when it was not previously clear "whether attempted aggravated criminal trespass was a lesser-included offense of attempted aggravated burglary"). In this instance, possession of a firearm during the commission of a dangerous felony has not previously been recognized as a lesser included offense of employment of a firearm during the commission of a dangerous felony. Moreover, while our application of Tennessee Code Annotated section 40-18-110(f)(1) establishes that possession of a firearm qualifies as a lesser included offense, that conclusion was not so readily apparent based on prior case law as to give rise to a clear and unequivocal rule of law. As a result, the omission of an instruction on possession of a firearm did not amount to the breach of a clear and unequivocal rule of law and does not support a finding of plain error.

Broderick Devonte Fayne, 2014 WL 5430049, at *8 (footnote omitted).

Similarly, at the time of the defendant's trial, possession of a firearm during the commission of a dangerous felony had not been recognized as a lesser-included offense of employment of a firearm during the commission of a dangerous felony. It has only been while the defendant's appeal is pending that the supreme court made that enunciation. Nevertheless, in furtherance of his assertion that the failure to give the instruction was plain error, the defendant points to footnote six in the Fayne opinion, in which the court noted:

In Terry, this Court focused on whether the lesser included offense had been recognized as such "at the time of trial." [118 S.W.3d] at 360. Later, the United States Supreme Court, construing the federal plain error rule, Fed. R. Crim. P. 52(b), held that plain error may be established when a trial court rules on an unsettled question of law and an intervening decision by a different court settles the question prior to appeal. Henderson v. United States, __ U.S. __, 133 S. Ct. 1121, 1129-30, 185 L. Ed. 2d 85 (2013). In this instance, the parties have not briefed or relied upon Henderson. Accordingly, we leave for a future case the question of whether the ruling in Henderson applies under Tennessee law.

Id. at *8 n.6.

The defendant views this footnote as an invitation to litigate the applicability of Henderson to Tennessee Rule of Appellate Procedure 36(b) in this case. However, at this juncture, this court is bound to follow Fayne and Terry, and the construction of Rule 36(b) in those cases that "the omission of an instruction on a lesser included offense does not result in the breach of a clear and unequivocal rule of law when the status of the crime as a lesser included offense is not apparent based on prior law." Fayne, 2014 WL 5430049, at *8. The Henderson decision involved the construction of a federal rule of criminal procedure and not the rule at issue in this case. The Tennessee Supreme Court may very well apply Henderson to Rule 36(b) in a future case or it might decline to do so, but at this time, the defendant cannot prove that the trial court's omission of a jury instruction on possession is plain error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE